**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

**CASE NO.:**

BENNDRICK CHARLES WATSON,

        Plaintiff,

vs.

WELLS FARGO BANK, N.A.,

        Defendant.

_____/

## COMPLAINT

Plaintiff, BENNDRICK CHARLES WATSON ("Mr. Watson") sues Defendant, WELLS FARGO BANK, N.A. ("Wells Fargo"), and states:

## INTRODUCTION

The word "Nigger" is perhaps the most offensive and inflammatory racial slur in the English language—a term that for more than a century has come to represent hatred, bigotry, prejudice, intolerance, and racism. However, to Wells Fargo, when its branch manager directed the word "Nigger" to Mr. Watson—it was a mere "mistake" and "it seems the utterance of the offensive term was unintentional." How, pray tell, can the use of the word "Nigger" be a "mistake" and "unintentional?" How does a white Wells Fargo employee—a branch manager, no less—use the word "Nigger" unintentionally?

One can only imagine the corporate culture and environment in which such a racial slur could be used and then explained away as a mistake. Yet, that is exactly how Wells Fargo explained it in its "apology" letter to Mr. Watson, a copy of which is attached as Exhibit "A." The discrimination endured by Mr. Watson is neither unique nor shocking—it is the pattern and practice of modern American corporations. Wells Fargo has a rich history of discrimination against

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Fort Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

African Americans and other minorities and Mr. Watson's is just another chapter in this tragic tale.

## JURISDICTION

1.      This is an action against Wells Fargo to recover damages pursuant to Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, *et seq.*, as amended, ("Section 1981").

2.      Jurisdiction of this Court arises under 28 U.S.C. § 1331 because the Complaint alleges a federal claim and requires the resolution of substantial questions of federal law.

3.      This Court has personal jurisdiction over Wells Fargo because: (a) Wells Fargo is operating, present, and doing business within this jurisdiction, and (b) Wells Fargo's breaches and illicit activity occurred within this jurisdiction.

4.      Venue in this District is proper under 28 U.S.C. § 1391(b) because all of the events and omissions complained of took place in the Middle District of Florida.

## PARTIES

5.      Mr. Watson is a citizen of the United States, and a person with standing to bring a claim under Section 1981.

6.      Mr. Watson is an African American male in his early 30s.

7.      Mr. Watson is a member of the Florida Bar in good standing, a recording artist, an entertainer, a yoga instructor, and more.

8.      Aside from being a licensed attorney and admitted to practice in this District—Mr. Watson has pursued his LL.M. in Entertainment & New Media Law.

9.      Wells Fargo is the primary subsidiary of Wells Fargo & Company, with its main office in Sioux Falls, South Dakota. Wells Fargo is a result of a merger between Wells Fargo & Company, Norwest Corporation, and Wachovia.

10.     Wells Fargo provides banking, investment, and mortgage products and services, as

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

well as consumer and commercial finance, through Wells Fargo's 7,950 locations and 13,000 automated tellers. Wells Fargo has over 70 million customers globally. Mr. Watson was simply hoping to be treated the same way as the many other millions of Wells Fargo customers.

11.    Along with Bank of America, Citigroup, and JPMorgan Chase, Wells Fargo is one of the "Big Four Banks" in the United States.

## BACKGROUND AND GENERAL ALLEGATIONS

12.    Wells Fargo serves the needs of individuals seeking personal banking, provides services to small businesses, as well as offers commercial banking solutions.

13.    Mr. Watson has had his personal checking account with Wells Fargo and its predecessor Wachovia, for over 10 years.

14.    Mr. Watson was in the process of opening his entertainment law firm and sought to open up a new business account with Wells Fargo.

15.    On April 8, 2019, at approximately 3:00 p.m., Mr. Watson went to the Wells Fargo branch at 12253 W. Linebaugh Ave, Tampa, Florida 33626.

16.    Mr. Watson first spoke with one Caucasian male who could not assist Mr. Watson and referred Mr. Watson to another Wells Fargo employee who also could not or otherwise refused to assist Mr. Watson. That employee then went into the manager's office and spoke with the manager for at least five minutes and upon exiting, told Mr. Watson that he needed to speak with the branch manager, Nelson Ferreira.

17.    Mr. Ferreira tried to mitigate the damage done by the prior employee and sought to defend the prior teller's inability to discover the fact that Mr. Watson has multiple accounts with Well Fargo. Mr. Watson simply could not understand what the issue was and and at the point, Mr. Ferreira used the N-word.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

18.   Upon hearing this ugly and offensive word uttered by a white branch manager in Hillsborough County, Florida—Mr. Watson was utterly shocked.

19.   Realizing the grave situation he now found himself, Mr. Ferreira tried desperately to get Mr. Watson to forgive or forget the incident.

20.   As Mr. Ferreira became more impatient and aggressive; Mr. Watson was in fear for his safety and had no choice but to exit the bank.

21.   Mr. Ferreira then followed Mr. Watson out to his car, which only made the situation worse and intensified Mr. Watson's fear and apprehension.

22.   Mr. Watson was outraged, humiliated, and traumatized.

23.   No explanation, other than blatant discrimination, exists for the conduct of Wells Fargo.

24.   Mr. Watson was able to open a business account at Grow Financial Federal Credit Union shortly after his abuse and discrimination by Wells Fargo.

**Banking While Black at Wells Fargo**

25.   It is no secret that Wells Fargo has high turnover and very poor training practices and procedures as is abundantly clear in online searches. Further, due to the high turnover rate of Wells Fargo employees—even reaching "41% in one 12-month period"—and many other reasons, new employees are not properly trained on how to deal with customers different than they are and are not provided adequate diversity training.

26.   Wells Fargo's conduct towards Mr. Watson is not unique or uncommon. Wells Fargo is all too familiar with claims of discrimination, and it appears that Wells Fargo's disregard for racial equality is a systemic problem reaching the highest levels of the organization.

27.   According to the Atlanta Journal-Constitution, in 2016, Sam Benson went to

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

withdraw funds at a nearby Wells Fargo branch. Wells Fargo called the police on Mr. Benson accusing him of fraud, an accusation which, ultimately, was found to be meritless and unwarranted. Mr. Watson and Mr. Benson share the same skin color.

28.     According to the lawsuit filed by Jean Romanie Elie, on June 1, 2017, Mr. Elie went to a Wells Fargo branch located in Palm Beach County, Florida, to draw cash from a prepaid credit card honored by Wells Fargo. Like Mr. Watson, Mr. Elie is of African descent. Without warning or reason, the Wells Fargo teller called the Palm Beach Sherriff's Office. Upon information and belief, there was no legitimate non-discriminatory reason for Wells Fargo to have called the police on Mr. Elie, who filed a lawsuit in the Palm Beach Circuit Court (Case No. 2018-CA-002116). It appears the case settled shortly after the court denied Wells Fargo's motion to dismiss Mr. Elie's amended complaint. Mr. Watson and Mr. Elie share the same skin color.

29.     On May 5, 2018, an African American ("B.M.") entered a Wells Fargo branch in a predominantly white area of town to conduct business. Wells Fargo called the police on B.M. accusing her of fraud, an accusation which, ultimately, was found to be completely meritless and unwarranted. Mr. Watson and B.M. share the same skin color.

30.     According to her lawsuit, Patrina Harrison, an African American woman entered a Wells Fargo branch in San Francisco, California to conduct business on June 18, 2018. The branch manager asked Plaintiff Harrison what was she doing in the bank and then told her to "get out, you're black!"

31.     On December 19, 2018, an African American ("Clarice") entered a Wells Fargo branch to cash a $200.00 corporate check that was drawn on a Wells Fargo bank account. Like Mr. Watson, Clarice is of African descent. Clarice provided two forms of identification, provided her thumb print, and waited to receive her funds. Wells Fargo called the police on Clarice accusing

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

her of fraud, an accusation which, ultimately, was found to be meritless and unwarranted. Mr. Watson and Clarice share the same skin color.

32.     On March 14, 2019, an African American man ("J.B.") entered a Wells Fargo branch in Delaware to conduct business. After giving him a very hard and refusing to allow J.B. to withdraw money out of his own account, Wells Fargo threatened to call the police on J.B. accusing him of fraud, which ultimately was found to be completely meritless and unwarranted. Mr. Watson and J.B. share the same skin color.

33.     On March 18, 2019, an African American man ("D.R.") entered a Wells Fargo branch in Whitehall, Pennsylvania to conduct business. After giving him a very hard and refusing to allow D.R. to withdraw money out of his own account, Wells Fargo accused D.R. of fraud, which ultimately was found to be completely meritless and unwarranted. Mr. Watson and D.R. share the same skin color.

34.     The above are just a few examples of similarly situated individuals that have come to the attention of the undersigned. Each of the above-referenced individuals are black. Each was racially profiled.[1]

35.     Moving away from the individual context, according to a July 12, 2012, Press Release form the United States Department of Justice, the Justice Department "filed the second largest fair lending settlement in the department's history to resolve allegations that Wells Fargo Bank, the largest residential home mortgage originator in the United States, engaged in a pattern or practice of discrimination against qualified African-American and Hispanic borrowers in its

---

[1] It must be noted that the above-referenced individuals represent only individuals that contacted the undersigned or were found after a cursory internet search.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

mortgage lending from 2004 through 2009."[2]

36.     The settlement was for $184.3 million in compensation and $50 million in direct down payment assistance.

37.     The complaint filed in the District of Columbia, bearing Case No. 12-cv-01150, alleges, in relevant part, the following:

> African-American and Hispanic wholesale borrowers paid more than non-Hispanic white wholesale borrowers, not based on borrower risk, but because of their race or national origin. Wells Fargo's business practice allowed its loan officers and mortgage brokers to vary a loan's interest rate and other fees from the price it set based on the borrower's objective credit-related factors . This subjective and unguided pricing discretion resulted in African-American and Hispanic borrowers paying more. Wells Fargo was aware the fees and interest rates it was charging discriminated against African-American and Hispanic borrowers, but the actions it took were insufficient and ineffective in stopping it.
>
> As a result of Wells Fargo's policies and practices, qualified African-American and Hispanic wholesale borrowers were placed in subprime loans rather than prime loans even when similarly-qualified non-Hispanic white borrowers were placed in prime loans. The discriminatory placement of wholesale borrowers in subprime loans, also known as "steering," occurred because it was the bank's business practice to allow mortgage brokers and employees to place a loan applicant in a subprime loan even when the applicant qualified for a prime loan.

*See United States v. Wells Fargo Bank, NA*, No. 1: 12-cv-01150-JDB (D.D.C. Sept. 21, 2012).

38.     Cities began suing Wells Fargo for its discriminatory lending practices, including Los Angeles, Oakland, Baltimore, Memphis, Miami, Cook County, Illinois, and Philadelphia.

39.     The case filed by the City of Miami even made it to the United States Supreme

---

[2] https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief (last visited December 27, 2018).

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

Court which held that the City was "an aggrieved person" authorized to bring suit under the FHA. *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296 (2017). The City of Miami "claim[ed] that two banks, Bank of America and Wells Fargo, intentionally issued riskier mortgages on less favorable terms to African–American and Latino customers than they issued to similarly situated white, non-Latino customers. *Id.* at 1300–01.

40.     On May 15, 2017, The City of Philadelphia filed a complaint in the Eastern District of Pennsylvania, bearing Case No. 17-cv-02203. The complaint alleged that Wells Fargo engaged in a "practice of issuing exploitative loan products" to minorities "as compared to the mortgage loans issued to similarly situated white borrowers."

41.     In 2017, a federal judge granted final approval to a $35.5 million class action settlement resolving claims of racial discrimination at Wells Fargo. Wells Fargo Advisors LLC was sued in the U.S. District Court for the Northern District of Illinois, bearing Case No. 13-cv-06368. The plaintiffs accused Wells Fargo Advisors LLC of maintaining employment policies that systemically and intentionally excluded African-American financial advisors from the company's best-paying work opportunities and that these policies effectively segregated Wells Fargo's employees, and disparately impacted African-American advisors. In addition to the monetary payments, Wells Fargo will implement policy changes designed to prevent racial discrimination within the company.[3]

42.     A Los Angeles jury deliberated nearly 4 weeks before determining that Wells Fargo discriminated against borrowers based on race.[4]

43.     In September 2017, a class action complaint was filed in the U.S. District Court for

---

[3] https://topclassactions.com/lawsuit-settlements/lawsuit-news/661027-wells-fargo-will-pay-35m-settle-race-discrimination-class-action/.
[4] http://blog.cvn.com/2011/03/24/3-5m-verdict-in-wells-fargo-discriminatory-lending-action.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

the Eastern District of Pennsylvania, bearing Case No. 17-cv-04119. The case alleges Wells Fargo engages in a "a company-wide pattern and practice of employment discrimination, both intentional and systemic, on the basis of race…."

44.     Rochelle Sims filed a similar case against Wells Fargo in the Southern District of Texas, bearing Case No. 16-cv-3212. On February 7, 2018, The Honorable Fray Miller denied Wells Fargo's motion for summary judgment.

45.     The list of cases in which Wells Fargo has been accused of racial discrimination goes on and on, and the above is just a representative sampling of such allegations.

46.     Of course, this is all besides the myriad other wrongdoings for which Wells Fargo has been fined. For example, in April of 2018, Wells Fargo was fined one-billion dollars ($1,000,000,000.00) by the Consumer Financial Protection Bureau and the Office of the Comptroller of the Currency for forcing customers into car insurance and charging mortgage-borrowers unfair fees.

47.     In February of 2018, the Federal Reserve "handed down unprecedented punishment late Friday for what it called the bank's "widespread consumer abuses," including its notorious creation of millions of fake customer accounts. Wells Fargo won't be allowed to get any bigger than it was at the end of last year -- $2 trillion in assets -- until the Fed is satisfied that it has cleaned up its act."[5]

48.     In May of 2018, U.S. District Judge Vince Chhabria of California's Northern District Court agreed to give final approval on a $142 million class-action settlement in response to Wells Fargo & Company's fake accounts scandal.

---

[5]    https://money.cnn.com/2018/02/02/news/companies/wells-fargo-federal-reserve/index.html?iid=EL.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

49.    In December 2018, Illinois Attorney General Lisa Madigan announced that Wells Fargo had agreed to pay approximately $17.3 million to resolve an investigation into Wells Fargo's misconduct in the marketing and sale of risky residential mortgage-backed securities (RMBS) leading up to the 2008 economic collapse.[6]

50.    On December 20, 2018, the Honorable Jon S. Tigar of the Northern District of California, in Case No. 3:16-cv-05479-JST, approved a class action settlement wherein Wells Fargo & Company are to pay $480 million to shareholders who said they were harmed by the bank's false statements about its misdeeds.

51.    Wells Fargo & Company and certain officers and directors of Wells Fargo, including its CEO, were alleged to have violated federal securities laws and made misrepresentations and omissions about Wells Fargo's "cross-selling" business model.

52.    In December 2018, a report authored by the Consumer Financial Protection Bureau[7] was released showing that Wells Fargo charges students the most in fees on average to have a bank account—nearly double the second and third ranked banks. Even though Wells Fargo held less than one-quarter of the total college-endorsed accounts, their account holders paid roughly half of the fees, according to data from the report.

53.    On December 28, 2018, Wells Fargo & Company, acting for Wells Fargo Bank, N.A. entered into a settlement agreement with the Attorneys General of the 50 states and District of Columbia[8]. The agreement was for $575m and resolved claims that Wells Fargo violated consumer protection laws in all states and the District of Columbia. "Wells Fargo's conduct was

---

[6] https://www.mpamag.com/news/wells-fargo-to-pay-17-3m-settlement-for-risky-rmbs-118300.aspx.

[7] https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/bcfp_foia_letter-to-department-education_record_2018-02.pdf.

[8] A copy of the settlement agreement can be found at https://bit.ly/2EOJtet.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

unlawful and disgraceful," California's attorney general, Xavier Becerra, said in a news release on December 28, 2018. California will get almost $149 million under the settlement.

54.     On January 2, 2019, California Insurance Commissioner Dave Jones accepted a settlement from Wells Fargo wherein Wells Fargo agreed to pay California $5 million to settle allegations that it committed insurance fraud. Further, Wells Fargo agreed to give up its insurance licenses for two years and to pay another $5 million if it ever wants to sell insurance in California again.[9]

55.     All conditions precedent to the commencement of this action have occurred and/or have been waived.

**COUNT I**
**Violation of § 1981**

56.     Mr. Watson repeats, realleges and incorporates paragraphs 1 through 55.

57.     As described above, Wells Fargo's outrageous conduct constituted discrimination because of Mr. Watson's race in violation of Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, *et seq.*

58.     Through Wells Fargo's discriminatory conduct, Wells Fargo deprived Mr. Watson of his right to make and enforce contracts on the same terms as enjoyed by white persons, in violation of 42 U.S.C. § 1981.

59.     Wells Fargo is liable for its employees' actions under the doctrine of *respondeat superior.*

60.     Mr. Watson is an African American man. Wells Fargo denied Mr. Watson the opportunity to open a business account solely because he is African American.

---

[9]     https://www.ocregister.com/2019/01/03/wells-fargo-pays-fine-drops-insurance-license-in-california/.

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

61.    Mr. Watson's race was the motivating factor behind Wells Fargo discrimination against Mr. Watson. By virtue of Wells Fargo's actions and inactions, as set forth above, Wells Fargo has violated § 1981.

62.    Wells Fargo's conduct in discriminating against Mr. Watson due to his race was intentional. Wells Fargo engaged in a discriminatory practice with malice, or with reckless indifference to, the federally protected rights of Mr. Watson.

63.    The 4th Circuit has observed:

> Far more than a "mere offensive utterance," the word "nigger" is pure anathema to African–Americans. Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates."

*Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001)(cleaned up[10]).

64.    Moreover,

> The use of the word "nigger" automatically separates the person addressed from every non-black person; this is discrimination *per se*. As the Supreme Court of Minnesota has stated:

> We cannot regard use of the term "nigger" as anything but discrimination based on race. When a racial epithet is used to refer to a black person, an adverse distinction is implied between that person and other persons not of his race. The use of the term "nigger" has no place in the civil treatment of a citizen.

---

[10] ""Cleaned up" is a new parenthetical used to eliminate unnecessary explanation of non-substantive prior alterations. *See* Jack Metzler, Cleaning Up Quotations, J. App. Prac. & Process (forthcoming 2018), http://dx.doi.org/10.2139/ssrn.2935374. This parenthetical can be used when extraneous, residual, non-substantive information has been removed, in this case, internal quotation marks, brackets, additional quoting parentheticals and an ellipsis." *See e.g. United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017). *United States v. Steward*, 880 F.3d 983, 987 (8th Cir. 2018); *United States v. Joiner*, 727 Fed. Appx. 821, 827 *fn.* 2 (6th Cir. 2018); *Sang Ho Na v. Gillespie*, 174 A.3d 493, 499 (Md. App. 2017). *Fairlie v. Transamerica Life Ins. Co.*, 2018 WL 3381405, at *1 (N.D. Iowa 2018).

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com

*Bailey v. Binyon*, 583 F. Supp. 923, 927–28 (N.D. Ill. 1984)(cleaned up) *citing City of Minneapolis v. Richardson,* 239 N.W.2d 197, 203 (Minn. 1976)

65.    The act of calling Mr. Watson a racial slur was an attempt to utterly degrade and dehumanize Mr. Watson in our society.

66.    As a direct and proximate result of Wells Fargo's actions, Mr. Watson has suffered personal humiliation, loss of capacity for the enjoyment of life, mental anguish, and embarrassment justifying an award including compensatory damages and punitive damages according to proof against Wells Fargo.

67.    As a result of the deprivations of rights at the hands of Wells Fargo, Mr. Watson has retained Rodal Law, P.A, to which Mr. Watson has agreed to pay a reasonable fee, which he is entitled to recover pursuant to 42 U.S.C. § 1988(b) and otherwise by law.

**WHEREFORE**, Plaintiff, BENNDRICK CHARLES WATSON, demands judgment against Wells Fargo, N.A. for damages, including punitive damages, attorney's fees and costs pursuant to 42 U.S.C. § 1988(b) and for any further relief as this Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff, BENNDRICK CHARLES WATSON, demands a trial by jury of all issues so triable.

Respectfully Submitted,

/s/ *Yechezkel Rodal*
Yechezkel Rodal, Esq.
Florida Bar No.: 91210
E-mail: Chezky@rodallaw.com
Rodal Law, P.A.
5300 N.W. 33rd Ave., Suite 219
Ft. Lauderdale, Florida 33309
Telephone: (954) 367-5308

*Counsel for Mr. Watson*

**Rodal Law, P.A.**
5300 N.W. 33rd Ave., Suite 219 ● Ft. Lauderdale, Florida 33309 ● Telephone (954) 367-5308 ● Facsimile (954) 900-1208
www.Rodallaw.com